UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


UNITED STATES                            CRIMINAL ACTION

VERSUS                                   NO: 10-284

RONALD MITCHELL                          SECTION: R
RAY JONES

## ORDER AND REASONS

Defendant Ronald Mitchell moves for a judgment of acquittal under Federal Rule of Criminal Procedure 29[1] and a new trial under Federal Rule of Criminal Procedure 33.[2]  For the following reasons, Mitchell's motions are DENIED.


## I.  BACKGROUND

This case arises out of testimony given in a civil deposition by two members of the New Orleans Police Department ("NOPD") in connection with the September 3, 2005 death of Danny Brumfield.  In the wake of Hurricane Katrina, defendants Ronald Mitchell and Ray Jones were patrolling the area around the Convention Center in downtown New Orleans in a marked police car. Jones drove, and Mitchell accompanied him in the front passenger seat.  As they drove past the Convention Center, Danny Brumfield approached their vehicle.  Mitchell ended up shooting Brumfield.

---

[1]    R. Doc. 64.

[2]    R. Doc. 65.

In response to the shooting, Brumfield's family filed a lawsuit in the United States District Court for the Eastern District of Louisiana against Mitchell, former Mayor Ray Nagin, the New Orleans Police Department, and former Superintendent of the New Orleans Police Department Eddie Compass.[3] They asserted federal claims under 42 U.S.C. § 1983 and sought relief "for injuries and damages arising out of intentional and outrageous acts of law enforcement."[4] In addition, they brought tort claims under Louisiana law.[5] The Brumfields contended that Mitchell and the NOPD's acts or omissions constituted "criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct that caused the assault and death" of Brumfield.[6]

The complaint alleged that when Brumfield approached the officers' car to seek assistance, the police car "bumped Mr. Brumfield."[7] The complaint alleged that the officers' car then "ran into Brumfield at a greater speed, throwing him onto the hood of the trunk."[8] The complaint further alleged that "Officer

---

[3]    Case No. 06-4834.

[4]    Gov't Ex. 5. at ¶3.

[5]    *Id.*

[6]    *Id.* at ¶4.

[7]    *Id.* at ¶7.

[8]    *Id.*

Ronald Mitchell shot Danny Ray Brumfield, Sr., through the windshield with a shotgun.  The officers did not leave their vehicle, nor di[]d they attempt to render assistance to Mr. Brumfield."[9]  Instead, plaintiffs alleged that the police vehicle ran over Brumfield's body.  The Brumfields requested damages for assault, wrongful death, survival claims, intentional infliction of emotional distress, and loss of consortium.[10]  They also asked for damages for mental and physical pain and suffering, emotional distress, loss of consortium, and economic loss for the negligent and intentional acts of the defendants.[11]  Finally, they sought general and specific damages, as well as punitive damages.

Mitchell and Jones testified in conjunction with this lawsuit in depositions on November 8, 2007 and June 4, 2008, respectively.  Relevant to these motions, Mitchell engaged in the following exchange at his deposition:

Q:   Okay.  Was that the point where you discharged your weapon?

A:   Yes.

Q:   What happened then?

A:   I got out of the car.

. . .

---

[9]     *Id.*

[10]    *Id.* at ¶10.

[11]    *Id.* at ¶11.

Q:   Then what happened [after you shot him]?

A:   He fell down.  <u>I got out of the car to see if he was alive or not.</u>[12]

. . .

Q:   Okay.  So you get out of your car to check Mr. Brumfield and what happened?  What did you see?

A:   No signs of life.

Q:   And how did you determine that?

A:   <u>I put my two fingers to his throat, the side of his throat, and checked for a pulse.</u>

Q:   Okay.  How long did that take?

A:   <u>Maybe five seconds.  Five to ten.</u>[13]

. . .

Q:   Okay.  You stayed by the body five seconds you said?

A:   Five to ten.[14]

. . .

---

[12]     R. Doc. 1 at 6-7; Gov't Ex. 14f at 53.  The statements charged as perjurious in the indictment are underlined.

[13]     R. Doc. 1 at 7; Gov't Ex. 14f at 54.

[14]     R. Doc. 1 at 7; Gov't Ex. 14g at 55.

Q:    Is it within seconds of you examining the body that
      you hear shots, or was it a greater passage of time
      than that?

A:    Negative.  <u>It was when I was taking the pulse.</u>

Q:    Okay.

A:    <u>Within that five to ten seconds of me taking the
      pulse I heard shots.</u>[15]

On September 30, 2010, a federal grand jury returned an
indictment against Mitchell and Jones, charging each with
obstruction of justice and perjury in connection with their
deposition testimony in Civil Case 06-4834.[16]  The indictment
charged Mitchell with obstruction of justice and perjury for
stating that Brumfield jumped off the hood of a patrol car and
lunged at him with a shiny object (Counts 1 and 2) and for
stating that he exited the vehicle to check Brumfield's pulse
after shooting him (Counts 3 and 4).  The indictment also charged
Jones with obstruction of justice and perjury for stating that
Mitchell exited the patrol car to check on Brumfield (Counts 5
and 6).

On December 5, 2011.  Mitchell moved to
continue the trial on the morning it was set to begin based on

Both defendants pleaded not guilty, and the Court conducted
a trial, which began on December 5, 2011.  Mitchell moved to
continue the trial on the morning it was set to begin based on

---

[15]    R. Doc. 1; Gov't Ex. 14g at 56.

[16]    R. Doc. 1.

late disclosures by the Government of potentially exculpatory material.[17]  The Court ordered the Government to make the witnesses at issue available to the defense before they were called to testify at trial and denied the motion to continue.[18] On December 8, 2011, both the Government and the defense rested. After deliberating for nearly eight hours, the foreman of the jury sent a note to the Court stating that the jury was deadlocked at that time as to two counts of the indictment.  The Court sent the jury home for the night and told the jury to return the next morning.  At that point, Mitchell moved for a mistrial, which the Court denied.  On December 9, 2011, the jury found Mitchell guilty of Counts 3 and 4 of the indictment and found him not guilty of the other counts.  The jury returned a verdict of not guilty for Jones.

Mitchell now moves the Court, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, for a judgment of acquittal on Counts 3 and 4.  Mitchell contends that (1) no reasonable juror could have found that the allegedly false statements at the center of Counts 3 and 4 were material, or obstructed or impeded justice, and (2) the "widely divergent and fractured descriptions" of the shooting could not have convinced any

---

[17]    R. Doc. 48.

[18]    R. Doc. 51.

reasonable juror that the statement was false.[19]  The Government

opposes this motion; it argues (1) that the statements were

material and (2) that the witnesses' testimony agreed on the

essential facts.[20]

Alternatively, Mitchell moves the Court for a new trial,

pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Mitchell reurges his grounds for a judgment of acquittal and

further argues: (1) that his motion to continue trial should have

been granted; (2) that a mistrial should have been granted after

the jury had been deliberating for eight hours; and (3) that the

verdicts are multiplicitous and should be set aside.[21]  The

Government opposes this motion for the same reasons it opposes

the motion for judgment of acquittal.  In addition, it contends

that (1) Mitchell was not prejudiced by the timing of the

disclosure of potentially exculpatory evidence; (2) the Court

acted within its discretion in denying Mitchell's motion for a

mistrial; and (3) Mitchell's argument on multiplicitous verdicts

is (a) untimely and (b) even if timely, each count contains

unique elements, which reflects Congressional intent to create

two separate offenses.[22]

---

[19]    R. Doc. 64-1 at 2-3.

[20]    R. Doc. 69.

[21]    R. Doc. 65-1.

[22]    R. Doc. 69.

**II.  MOTION FOR JUDGMENT OF ACQUITTAL**

**A.  Standard**

"A motion for judgment of acquittal challenges the sufficiency of the evidence to convict." *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005)(quoting *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998)).  When the defendant challenges the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Lopez-Urbina*, 434 F.3d 750, 757 (5th Cir. 2005)(applying *Jackson*).  The same test applies whether the Government's case depends on direct or entirely circumstantial evidence.  *United States v. Thomas*, 627 F.3d 146, 151 (5th Cir. 2010)(citing *United States v. Clayton*, 506 F.3d 405, 412 (5th Cir. 2007).  The Court considers the evidence, all reasonable inferences drawn therefrom, and all credibility determinations in the light most favorable to the Government. *United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008); *see also United States v. Resio-Trejo*, 45 F.3d 907, 910-11 (5th Cir. 1995).  The Court does not weigh the evidence or assess the credibility of witnesses.  *Ramos-Cardenas*, 524 F.3d at 605. The evidence need not exclude every reasonable hypothesis of

innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence. *Id.; see also Resio-Trejo*, 45 F.3d at 911. The jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001)(citation and internal quotation marks omitted).

Mitchell argues that a rational trier of fact could not find that the false statements at the root of both the obstruction of justice count and the perjury count had a meaningful effect on the outcome of the civil lawsuit. In addition, Mitchell argues that the "widely divergent and fractured" testimony by the Government witnesses could not have convinced a reasonable trier of fact that the statements were false.[23]

**B.    Perjury**

*1.    Falsity*

Mitchell contends that the witnesses' testimony that led to his conviction varied so widely that no reasonable jury could have been convinced beyond a reasonable doubt that the statements were false.[24]    Although witnesses gave varying accounts of the events on the evening of the shooting, the record reflects that

_____

[23]    R. Doc. 64-1 at 2-3.

[24]    R. Doc. 64-1 at 6.

not one witness testified that the car carrying Mitchell and Jones stopped after Mitchell shot Brumfield.

Christopher Howard, a friend of Danny Brumfield's niece, Africa Brumfield, testified that he was sitting in a chair outside the Convention Center when Brumfield was shot.[25] Although the darkness limited his sight, Howard testified that Brumfield came from the neutral ground to engage the police car. He stated that the police car did not have its overhead lights on. Howard testified that Brumfield jumped up, lay flat on the hood of the car, and started sliding off. As Brumfield slid off, Mitchell shot him while his feet were in the air. Howard estimated that five minutes elapsed between when the car stopped and when Mitchell shot Brumfield, but he made clear that he was not sure of the time frame. After Brumfield was shot, Howard testified that the "police kept going." He further stated that the police car "was speeding on. It just kept going." Howard said that no one got out of the car and no one attempted to take Brumfield's pulse.

Steve Banka, a neighbor of Brumfield's sister, testified that he too was sitting in front of the Convention Center.[26] Banka testified, however, that Brumfield approached the police car from the Convention Center side of the street. Banka stated

---

[25] Trial Test. of Christopher Howard.

[26] Trial Test. of Steve Banka.

10

that Brumfield ran in front of the car, waving his hands. The
police car hit Brumfield and Brumfield was shot, causing
Brumfield to flip backwards and land on his back. Banka stated
that he did not see Brumfield lying on the hood of the car. Like
Howard, Banka testified that the police car did not stop after
Brumfield was shot, and that he did not see anyone exit the
police car.

Africa Brumfield, Brumfield's niece, also sat on the curb
outside the Convention Center and saw a police car approach with
its overhead lights flashing.[27] Ms. Brumfield agreed with Banka
that Danny Brumfield approached the police car from the
Convention Center side of the street. After the car hit
Brumfield once, Ms. Brumfield testified that he jumped on top of
the car where he was spinning and trying to reach for the
driver's side window. Ultimately, according to Ms. Brumfield,
Danny Brumfield came down on the driver's side of the car. Then
she heard a shot ring out, and Brumfield went down. Ms.
Brumfield testified that the police car left immediately after
that, running over Brumfield's body. Ms. Brumfield testified
that although the police officers remained stopped for a couple
of seconds after the shooting, no one got out of the vehicle.

Sergeant Kendrick Allen, a ten-year veteran of the NOPD,
testified that a group of officers, including himself,

---

[27]    Trial Test. of Africa Brumfield.

11

Kermanshiah Perkins, Joynal Abdin, Greg Hill, Mitchell and Jones, was assigned to meet a contingency of officers at the Convention Center.[28]  Officer Abdin drove a red pickup truck with Sergeant Allen in the front passenger seat.  Officer Perkins sat behind Sergeant Allen, and Officer Hill sat behind Officer Abdin. Sergeant Allen estimated that their car was initially three or four car lengths behind Mitchell and Jones.  While initially the lights on Mitchell and Jones's car were not on, Sergeant Allen testified that they came on as the red truck approached the Convention Center.  Sergeant Allen heard shots fired, causing him to turn toward Mitchell and Jones's car, which he saw swerve to the left.  Sergeant Allen further testified that after the car swerved, both cars increased speed and left the scene, heading toward the Crescent City Connection.  He also stated that Mitchell and Jones's car continued to move in a forward direction after he heard shots and that both their car and the red truck left the scene right away.

Officer Kermanshiah Perkins testified that he saw a man who came from the neutral ground jump on Mitchell and Jones's car in front of the Convention Center.[29]  At this point, Officer Perkins was about a car length behind Mitchell and Jones.  Officer Perkins testified that the man jumped in the air, and as he was

_____

[28]    Trial Test. of Kendrick Allen.

[29]    Trial Test. of Kermanshiah Perkins.

coming down Mitchell and Jones swerved.  After the man landed on

the hood, he immediately fell off.  Officer Perkins did not see

the man make any offensive motions toward the officers in the

car.  Officer Perkins testified that the man fell off the car at

the same time he heard the gunshots and that "everything was

simultaneous[]."  After he heard gunshots, both cars left the

scene.  He did not see anyone leave the Mitchell and Jones car or

take the man's pulse.

The jury also heard testimony from Officer Keith Joseph, a

24-year veteran with the NOPD, who took Mitchell's statement

after the incident.[30]  In relevant part, the report states:

> The subject was struck in the torso area where he
> sustained a fatal wound.  Due to an enormous crowd of
> people the officers wisely retreated to a safe area and
> notified the Captain Kelly of the Public Housing COPS
> Unit.  Upon arrival of backup, the officers relocated to
> the scene.  Officers then began checking Mr. Brumfield's
> vital signs and there were no signs of life.[31]

When the Government asked Officer Joseph if Mitchell "ever got

out of the car and checked on the person who he shot," Officer

Joseph testified "Not at that time.  They didn't check on

anyone."  Officer Joseph testified that he took Mitchell's

statement roughly four days after the incident.

In sum, Christopher Howard, Steve Banka, Africa Brumfield,

Kendrick Allen, and Kermanshiah Perkins each testified that no

---

[30]     Trial Trans. of Keith Jospeh.

[31]     Gov't Ex. 15.

one exited Mitchell and Jones's vehicle after Danny Brumfield was shot. Further, each witness testified that no one checked on Brumfield's condition or took his pulse. Although the witnesses may not have testified consistently on every detail concerning the events of the evening of the shooting, Brumfield's family and friends testified consistently with Mitchell's fellow police officers about whether Mitchell exited his vehicle and checked Brumfield's pulse. The jury could credit this consistent testimony regarding the falsity of Mitchell's statements. *United States v. McElwee*, 646 F.3d 328, 340 (5th Cir. 2011)("The credibility of witnesses is a matter for the jury and its determinations demand deference.")(quoting *United States v. Dadi*, 235 F.3d 945, 951 (5th Cir. 2000)); *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001)("A jury is free to choose among reasonable constructions of the evidence . . . And it retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses.")(citations omitted). Further, inconsistent testimony is not "conclusive proof that one version of events must be credited over another." *United States v. Bennett*, 664 F.3d 997, 1012 (5th Cir. 2011). Viewing the evidence in the light most favorable to the Government and giving deference to the jury's credibility determinations, a rational jury could have found beyond a reasonable doubt that Mitchell's statements were false.

*2.    Materiality*

*a.    Standard*

Mitchell also contends that he is entitled to a judgment of
acquittal on Count 4 because the statements, even if they were
false, were nevertheless not material.  Count 4 makes it a crime
for any person who has taken an oath to testify truthfully before
a competent tribunal, officer, or person, in any case in which a
law of the United States authorizes an oath to be administered,
to willfully state or subscribe to any material matter which he
does not believe to be true.  18 U.S.C. § 1621.  Materiality
requires that the defendant's statements had a natural tendency
to influence, or were capable of influencing, the decision of the
decisionmaking body to which they were addressed.  *United States
v. Brown*, 459 F.3d 509, 529 (5th Cir. 2006)(citing *United States
v. Gaudin*, 515 U.S. 506, 509 (1995))(internal quotations
omitted); *U.S. v. Abrams*, 568 F.2d 411, 420 (5th Cir. 1978)("The
test for materiality . . . is whether the false testimony was
capable of influencing the tribunal on the issue before
it.")(citing cases).[32]  Statements can be material if they are
"relevant to any subsidiary issue or [are] capable of supplying a
link to the main issue under consideration."  *Brown*, 459 F.3d at

---

[32]    The Fifth Circuit treats the materiality standard under
18 U.S.C. § 1621 and  18 U.S.C. § 1623 identically.  *See U.S. v.
Williams*, 1 F.3d 1237, 1993 WL 310286, at *3 (5th Cir. May 6,
1993).

15

530 n.18 (citing *United States v. Griffin*, 589 F.2d 200, 207 (5th Cir. 1979)).  *See also Abrams*, 568 F.2d at 420 ("the statements need not be material to any *particular* issue but may be material to any proper matter of inquiry").

To be material, "the false statement need not *actually* affect the tribunal's decision; it need only be *capable* of affecting the tribunal's decision." *United States v. Salinas*, 923 F.2d 339, 341 (5th Cir. 1991)(emphasis added)(rejecting a "natural effect or tendency to influence" materiality test for false statements).  *See also Abrams*, 568 F.2d at 421 ("All the law requires is that the witness's answers were capable of influencing the tribunal on the issue before it, including any matters collateral thereto.").  In the case of a deposition, the statements must be material to the proceeding in which the deposition is taken.  *United States v. Holley*, 942 F.2d 916, 923 (5th Cir. 1991).  But the Fifth Circuit has held that when perjury prosecutions are based on statements made in civil depositions, "some account must be taken of the more liberal rules of [civil] discovery." *Holley*, 942 F.2d at 924.  *See also United States v. Wilkinson*, 137 F.3d 214, 225 (4th Cir. 1998) (noting that *Holley* holds that materiality "includes matters properly the subject of and material to a deposition under Federal Rule of Civil Procedure 26(b)(1)").  This is because a deponent should "be held to his oath with respect to matters

properly the subject of and material to the deposition, even if the information elicited might ultimately turn out not to be admissible at a subsequent trial." *Holley*, 942 F.2d at 924. *See also United States v. Gremillion*, 464 F.2d 901, 905 (5th Cir. 1972)("Materiality need only be established as of the time the answers were given."); *United States v. Gaudelli*, 134 Fed. Appx. 565, 568 (3d Cir. 2005)("a false statement's capacity to influence a fact finder is judged at the time the statement was made").

   *b. Civil Suit*

   Examining the civil complaint under the pleading standard applicable under the Federal Rules of Civil Procedure, the Court finds that the Brumfields stated several causes of action under several legal theories.  First, the facts alleged stated a claim for the violation of Brumfield's civil rights through the defendant's use of deadly force in violation of the Fourth Amendment when Mitchell shot Brumfield.  To sue for the use of excessive force, plaintiffs must prove "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Collier v. Montgomery*, 569 F.3d 214, 218 (5th Cir. 2009).  "The use of deadly force is constitutional when the suspect poses a threat of serious physical harm to the officer or

17

others." *Elizondo v. Green*, – F.3d –, 2012 WL 447269, at *3 (5th Cir. 2012). Here, plaintiffs alleged that Brumfield tried to stop Mitchell's police car to seek help but the police intentionally bumped Brumfield twice with the police car, throwing him onto the vehicle. Then plaintiffs alleged that Mitchell shot Brumfield through the windshield, and the police car ran over the body and fled the scene without attempting to render assistance to Brumfield. These allegations state a civil rights claim for excessive force.

Second, the complaint alleged the factual basis of a claim for the denial of medical care. "The Fourteenth Amendment requires that state officials not disregard the 'basic human needs' of pretrial detainees, including medical care." *Estate of Henson v. Krajca*, 440 Fed. Appx. 341, 343 (5th Cir. 2011)(quoting *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996)). *See also Nerren v. Livingston Police Dept.*, 86 F.3d 469, 472 (5th Cir. 1996)("An arrestee's complaint for denial of substantive due process and a pretrial detainee's complaint for denial of substantive due process are evaluated under the same standards."). A plaintiff can maintain a denial of medical care claim even if the events that give rise to the claim occur before he is in custody. *Mace*, 333 F.3d at 625-26 (suspect behaving erratically was detained by officers, pepper sprayed, and ultimately died from injuries inflicted by officers); *Batiste v.*

*Theriot*, No. 10-31263, 2012 WL 89414, at *4 (5th Cir. Jan. 10, 2012)(suspect running away from police officers was tased and sued for denial of medical care); *Abshure v. Prator*, 392 Fed. Appx. 267, 269 (5th Cir. 2010) (plaintiff, a diabetic, alleged that arresting officer prevented her from injecting insulin and sued for denial of medical care); *Bailey v. Turner*, 149 Fed. Appx. 276, 278-79 (5th Cir. 2005)(plaintiff sued for denial of medical care after arresting officers allegedly pepper sprayed him during arrest). In *Mace*, police responded to a disturbance at a mobile home park and encountered the decedent "yelling, cursing, brandishing an eighteen to twenty inch sword and breaking windows." *Mace*, 333 F.3d at 622. Although one of the officers attempted to calm the decedent, he continued brandishing the sword and made "punching motions" with it. *Id.* at 623. When he raised the sword toward the officers, who were standing eight to ten feet from him, one of the officers shot him. *Id.* The decedent dropped the weapon but continued to disregard the officers' orders to lie down. *Id.* The officers finally subdued him with pepper spray and brought him to the ground. *Id.* When the ambulance arrived on the scene, one of the arresting officers drove the ambulance to the hospital so that the medical personnel could attend to the decedent. *Id.* This caused a delay in the ambulance's departure, which formed the basis of the decedent's claim for denial of medical care against the arresting officers.

*Id.* Although the Fifth Circuit ultimately denied the claim, it analyzed the claim by examining whether the officer had the subjective intent to cause harm immediately following the shooting. *Id.* at 625-26. That the decedent was not yet in custody did not impact the court's analysis.

An official constitutionally denies medical care when he acts with deliberate indifference. *Nerren*, 86 F.3d at 473. To succeed in demonstrating deliberate indifference, a plaintiff must prove that "the official knows of and disregards an excessive risk to [the victim's] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002)(quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). *See also Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003)(the constitutional right to medical care "is violated if an officer acts with deliberate indifference to a substantial risk of serious medical harm and resulting injuries."). Here, the allegation that Mitchell fled the scene after shooting Brumfield without making an attempt to assist Brumfield could support a denial of medical care claim.

Third, the complaint clearly seeks punitive damages. A "jury may award punitive damages in a federal civil rights action based on 42 U.S.C. § 1983 'when the defendant's conduct is shown

to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Lincoln v. Case*, 340 F.3d 283, 291 (5th Cir. 2003)(quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). "Reckless or callous indifference" requires "recklessness in its subjective form, *i.e.*, a subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations." *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1015 (5th Cir. 2003) (internal quotations and citations omitted). Here, plaintiffs claimed damages, including punitive damages, for the "intentional and outrageous acts of law enforcement" and for defendant's reckless and callous disregard of Danny Ray Brumfield['s] . . . civil rights." The Brumfields' allegation that the circumstances surrounding Brumfield's shooting demonstrated intentional and outrageous acts stated a claim for punitive damages under Section 1983.

    *C.   Discussion*

    Mitchell contends that his statements that he exited the vehicle and checked Brumfield's pulse are not material because they do not provide a "causal link" between Mitchell's unconstitutional act and Brumfield's death.[33] He further contends that "for a statement to be material, it must address or

───────────────

    [33]    R. Doc. 64-1 at 4.

be capable of affecting an essential element in the plaintiffs' cause of action,"[34] relying on *Abrams*, 568 F.2d at 420. Mitchell identifies the allegation in the complaint that the "officers did not leave their vehicle" and contends that this statement "is not identified as a constitutional violation, a breach of duty, or the basis of a cause of action."[35] As such, Mitchell argues that the statement, even if false, "could not have sufficient significance to the outcome of the lawsuit for it to be deemed material . . . ."[36]

The Court first observes that Mitchell seeks to cabin the scope of materiality more narrowly than is justified under Fifth Circuit precedent. In *Holley*, the Fifth Circuit held that materiality includes both matters capable of influencing the outcome at trial and matters that are properly the subject of a deposition under the Federal Rules of Civil Procedure. *Holley*, 942 F.2d at 923-24. In Mitchell's case, the Court finds Mitchell's statements were not only material to matters properly the subject matter of the civil deposition, but also that his answers were material to the outcome of the lawsuit in which his deposition was taken.

---

[34] *Id.*

[35] R. Doc. 64-1 at 5.

[36] *Id.*

The complaint clearly identified and described intentional and willful behavior by Mitchell for which plaintiffs sought punitive damages. Plaintiffs alleged that after the police rammed Brumfield with the police car, Mitchell intentionally shot Brumfield. Following the shooting, the complaint alleged that Mitchell did not leave the vehicle and did not attempt to render assistance to Brumfield. Instead, the officers fled the scene and ran over Brumfield's body. These acts are characterized as "intentional, willful, outrageous, reckless, [and] flagrant misconduct."

When Mitchell testified in his deposition that he exited the vehicle in order to check on Brumfield's pulse, he skewed the narrative of events and painted a wholly different picture of himself. *Cf. United States v. DeGeorge*, 380 F.3d 1203, 1218 (9th Cir. 2004)(perjurious statements arising from civil deposition were material when the defendant offered those statements as part of his defense, "thus indicating his belief in the story's materiality"). Contrary to the allegations of intentional disregard for Brumfield's rights alleged in the complaint, Mitchell's testimony suggests that he took what remedial measures he could under the circumstances. His statements were material because, if true, a jury could find it less likely that Mitchell willfully and callously shot Brumfield and more likely that Mitchell's version of the shooting was true. For this reason,

the statements were material to the existence of the excessive force claim.

Mitchell's false testimony also could have influenced the fact finder on plaintiffs' denial of medical care claim. Had he testified truthfully, his testimony could have supported a finding that he deliberately disregarded an excessive risk to Brumfield's health by leaving him in the street after he shot him. Finally, his testimony, which suggested he was solicitous of Brumfield's condition, was material to whether punitive damages were recoverable under Section 1983 for reckless and callous indifference to Brumfield's constitutional rights.

Mitchell directs the Court to *United States v. Qaisi*, 779 F.2d 346 (6th Cir. 1985), in support of his argument that his statements were not material.[37] This argument is misplaced because the statement at issue in *Qaisi* was not merely tangential, but it was also wholly irrelevant to the underlying event. In *Qaisi*, the indictment accused the defendant of making material false statements in connection with citizenship proceedings. At his citizenship hearing, the defendant testified that he and his wife were "living together as man and wife and had resolved their marital difficulties." *Qaisi*, 779 F.2d at 347. The Sixth Circuit held that, while false, this statement was not material because the only issue upon which the

---

[37]    R. Doc. 64-1 at 5.

24

citizenship application turned was whether the marriage was pretextual, not whether it was viable. *Id.* at 348. Any statements about viability were therefore immaterial as a matter of law and could not sustain a perjury conviction.

For the foregoing reasons, the Court finds that a reasonable jury could have found that Mitchell's statements were capable of influencing the outcome of the civil suit and are therefore material.

**B.    Obstruction of Justice**

Mitchell also challenges the evidence supporting his conviction for obstruction of justice. "Under 18 U.S.C. § 1512(c)(2), it is a crime to 'corruptly . . . obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so." *United States v. Bennett*, 664 F.3d 997, 1013 (5th Cir. 2011)(quoting 18 U.S.C. § 1512(c)(2)). "An act of influencing, impeding, or obstructing justice includes any means producing or capable of producing an effect that prevents justice from being duly administered." *United States v. Neal*, 951 F.2d 630, 633 (5th Cir. 1992)(interpreting 18 U.S.C. § 1503). *See also* Karen Patton Seymour et al., *Prosecution of Process Crimes: Thoughts and Trends*, 37 Geo. L.J. Ann. Rev. Crim. Proc. iii, *viii (2008) ("the language of sections 1503 and 1512(c) are nearly identical"). An "act with the 'natural and probable effect' of

interfering with the due administration of justice satisfies the intent requirement for obstruction of justice." *United States v. Sharpe*, 193 F.3d 852, 865 (5th Cir. 1999)(quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995)); *United States v. Johnson*, 485 F.3d 1264, 1270 (11th Cir. 2007)("False testimony can provide the basis for a conviction [of obstruction of justice] so long as it has the 'natural and probable effect' of interfering with the administration of justice.")(quoting *United States v. Thomas*, 916 F.2d 647, 651 (11th Cir. 1990)).  A civil deposition constitutes an official proceeding under this section.  *United States v. LeMoure*, 474 F.3d 37, 42 (1st Cir. 2007).

Here, the purpose of a deposition is to obtain evidence to be used at trial or to obtain evidence that would lead to admissible evidence at trial.  *See Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 392 (5th Cir. 2009)("[t]he role of discovery . . . is to find support for properly pleaded claims"); Fed. R. Civ. P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").  Had Mitchell testified truthfully, plaintiffs could have used his deposition statement at trial as a material admission.  Specifically, plaintiffs could have introduced a concession by Mitchell that he left the scene to prove their denial of medical care claim, as well as their claim

26

for punitive damages.  By testifying falsely, Mitchell prevented the deposition from serving its intended purpose of eliciting this evidence.  *See United States v. Brown*, 459 F.3d 509, 531 (5th Cir. 2006)(finding that perjurious testimony supported conviction of obstruction of justice because defendant "closed off entirely the avenue being pursued, namely, his knowledge or understanding of what actually occurred"); *Johnson*, 485 F.3d at 1270 (false testimony obstructed proceeding when it precluded fact-finder from discovering defendant's "knowledge or belief as to the legality of his actions").  A rational jury could find that Mitchell's false statements interfered with the administration of justice.

For the foregoing reasons, Mitchell's motion for judgment of acquittal must be denied.

## II.  NEW TRIAL

### A.  Rule 33

Rule 33(a) of the Federal Rules of Criminal Procedure states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires . . . ."  Fed. R. Crim. P. 33(a).  A "court should not grant a motion for new trial unless there would be a miscarriage of justice or the weight of the evidence preponderates against the verdict."  *U.S. v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004).

*See also United States v. Piazza*, 647 F.3d 559, 565 (5th Cir. 2011)("motions for new trial are disfavored and must be reviewed with great caution").  "A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant."  *Id.* (citing *U.S. v. Rasco*, 123 F.3d 222, 228 (5th Cir. 1997).

Mitchell contends that he is entitled to a new trial based on (1) his statements' lack of materiality and tendency to obstruct, (2) the witnesses' lack of credibility, (3) the late disclosure of potentially exculpatory information, (4) the denial of his motion for mistrial after the jury announced they were deadlocked, and (5) that the verdicts are multiplicitous and must be set aside.[38]

## B.   Materiality and Tendency to Obstruct Justice

Mitchell reurges his contention that no jury could find that Mitchell's statements were material; nor could a jury find that his statements had the natural and probable effect of impeding justice.[39]  The Court rejects this argument and has already explained why the statements were both material and had the

---

[38]   Although Mitchell argues that he is entitled to a new trial based on cumulative error, he does not brief this argument. *See* R. Doc. 65-1 at 3.  Accordingly, the Court considers this argument waived.

[39]   R. Doc. 65-1 at 5.

natural and probable effect of impeding the due administration of justice.  Because there was sufficient evidence to support a finding on both of these elements, the weight of the evidence did not preponderate against the verdict, and no miscarriage of justice will occur in denying Mitchell's motion for a new trial on these grounds.

### C.    Witness Credibility

Mitchell also reurges his argument that the witnesses' conflicting accounts of the events on September 3, 2005 entitle him to a new trial.  Unlike reviewing a motion for judgment of acquittal, the Court must "carefully weigh the evidence and may assess the credibility of the witnesses during its consideration of the motion for new trial." *United States v. Herrera*, 559 F.3d 296, 302 (5th Cir. 2009)(quoting *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005)).  But the Court "must not entirely usurp the jury's function or simply set aside a jury's verdict because it runs counter to [the] result the district court believed was more appropriate." *Id.*  Here, the Court has already noted certain discrepancies in Christopher Howard, Steve Banka, Africa Brumfield, Kendrick Allen, and Kermanshiah Perkins's accounts of that evening.  Each witness, however, consistently testified that Mitchell did not exit his vehicle or check Danny Brumfield's pulse after shooting him.  Moreover, both friends and

family of Brumfield's as well as Mitchell's fellow police officers consistently testified that Mitchell did not check on Brumfield.  Further, Officer Joseph testified that Mitchell did not mention taking Brumfield's pulse when he took Mitchell's statement four days after the accident.  The statement itself states that officers "began checking Mr. Brumfield's vital signs" *after* Mitchell and Jones returned to the Convention Center, having left immediately after the shooting.[40]  After weighing the evidence and assessing the credibility of the witnesses, the Court finds that a new trial is not warranted because the witness testimony did not conflict on the issue of the falsity of Mitchell's statement.

**D.   Brady Claim**

A defendant who seeks a new trial on the basis of a *Brady* violation must show that "(1) the prosecution did not disclose the evidence; (2) the evidence was more favorable to the defense; and (3) the evidence was material."  *United States v. Bennett*, 664 F.3d 997, 1012 (5th Cir. 2011)(quoting *United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010).  "Evidence is material if, had it been disclosed, there is a reasonable probability the result would have been different – that is, a probability

---

[40]    Gov't Ex. 15.

sufficient to undermine confidence in the outcome." *Id.* (citing *Davis*, 609 F.3d at 696).

Mitchell contends that the Court should have granted his motion to continue in order to allow him more time to "revamp [his] defense."[41] On December 5, 2011, roughly fifteen minutes before trial was to commence, Mitchell filed a motion to continue based on potentially exculpatory material that had been recently disclosed to the defense.[42] The Court held a conference about the disclosures, during which the Government represented that it had informed Mitchell's counsel about this potentially exculpatory information on November 26, 2011.[43] Five days before trial, on November 30, 2011, the Government gave the defense the FBI 302 of a March 13, 2010 interview with David Augustin, Danny Brumfield's brother-in-law. Mitchell asserts that in the 302, Augustin represented that Brumfield had scissors in his hand when he jumped on Mitchell and Jones's car, which contradicts other witnesses' testimony about whether Brumfield had scissors that night.[44] On the same day, the Government also turned over Africa Brumfield's May 6, 2010 Grand Jury testimony in which she stated

---

[41] R. Doc. 65-1.

[42] R. Doc. 48-1 at 1.

[43] R. Doc. 69-1, Aff. of Michael W. Magner.

[44] R. Doc. 65-1 at 8.

that Brumfield looked "furious" when he approached the police car.

The Court denied the motion to continue, but ordered the Government to make David Augustin and Africa Brumfield available for the defense to interview before they were called as witnesses.[45] Although the Court held that the Government should have disclosed this material when it acquired it, the Court denied the continuance because the material "is of a nature that can be used reasonably by the defense with the accommodations I have ordered, and I do not believe that there's going to be prejudice because of this." Counsel for Mitchell interviewed Augustin in the evening on December 5, 2011.[46]

Mitchell contends that if the Government had turned over this evidence earlier, he would have had an opportunity to present a different defense. Because Mitchell actually received the *Brady* material, the relevant inquiry is whether Mitchell had an opportunity to "put it to effective use at trial." *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003)("If the defendant received the material in time to put it to effective use at trial, his conviction should not be reversed simply because it was not disclosed as early as it might have and, indeed, should have been.")(quoting *United States v. McKinney*,

---

[45]     Trial Trans. of Dec. 5, 2011.

[46]     R. Doc. 69-1 at 2.

758 F.2d 1036, 1050 (5th Cir. 1985)). Although Mitchell contends that he received this material too late to change his defensive strategy, the Court notes that the Fifth Circuit routinely denies *Brady* claims based on evidence turned over within a similar time frame, or even disclosed after the witness testifies at trial. *See, e.g., United States v. Manners*, 384 Fed. Appx. 302, 309 (5th Cir. 2010)(defense was not prevented from putting evidence to effective use when material was turned over one week before trial); *United States v. Senegal*, 371 Fed. Appx. 494, 501 (5th Cir. 2010)(defense was not prevented from using impeaching evidence on cross-examination that they first learned about on direct examination at trial); *United States v. O'Keefe*, 128 F.3d 885, 899 (5th Cir. 1997)(defense effectively used 302s turned over after cross-examination had begun); *United States v. Johnston*, 127 F.3d 380, 391 (5th Cir. 1997)(no *Giglio* violation when fact of plea agreement and grand jury testimony were not given to defense until after witness began testifying).

Here, Mitchell was given the opportunity to interview both witnesses before they testified at trial. Mitchell received David Augustin's 302 one week before Augustin testified on December 7, 2011. Mitchell's counsel cross-examined Augustin and asked him several questions about whether or not Danny Brumfield had scissors in his possession that evening. Mitchell's counsel also asked Augustin several questions about the contents of his

302. Likewise, the record reflects that Mitchell was able to use Africa Brumfield's grand jury testimony when he asked her a series of questions about whether Danny Brumfield was furious when he approached the police car that night. *United States v. Neal*, 27 F.3d 1035, 1050 (5th Cir. 1994)(no *Brady* violation where defense effectively used exculpatory memorandum because they had it in advance of witness's testimony and used it during cross-examination). Further, Mitchell had the opportunity to interview Africa Brumfield but chose not to do so. Because Mitchell was not prejudiced by the timing of the disclosures, his motion for new trial based on *Brady* must be denied.

### E.    Jury Deadlock

Mitchell contends that the Court should have granted the mistrial he requested after the jury had been deliberating for several hours. The Court's decision to grant a mistrial when a jury is deadlocked is "accorded great deference by a reviewing court." *Arizona v. Washington*, 434 U.S. 497, 510 (1978)(citing cases). *See also United States v. Walker*, 559 F.2d 365, 370 (5th Cir. 1977)("It is a settled rule that the trial judge has broad discretion in the management of the trial."). When a defendant moves for a mistrial, "the . . . court should consider the length of the trial, the complexity of the issues involved and the

length of deliberations." *United States v. Gordy*, 526 F.2d 631, 636 (5th Cir. 1976).

The trial in this case lasted for three and a half days. The jury heard testimony from 12 different witnesses in a case arising under a six count indictment. After deliberating for roughly four hours, the jury sent a note to the Court stating that they had deadlocked on two counts.[47] The Court sent the following note to the jury: "I will refer you again to my instructions on your duty as jurors to deliberate with each other. Please continue your deliberations in an effort to reach an agreement if you can do so."[48] Three hours later, the foreman sent another note to the Court stating that "We are unable to reach a unanimous verdict on 3 and 4. I do not foresee any movement at this time. We are deadlocked."[49] The Court showed the note to the Government and the defense and heard from both sides about how they wished to proceed. The Court stated: "The note says I do not foresee any movement at this time and so that suggests to me that there might be some movement later." The Court then brought the jury back in and told them to

---

[47]    R. Doc. 54-1 at 1.

[48]    R. Doc. 54-1 at 2.

[49]    R. Doc. 54-1 at 3.

35

> go home and get a good night's sleep and come back first
> thing in the morning after you have had a good night's
> sleep and deliberate, see if you can deliberate some more
> with an eye toward whether you can reach unanimous
> verdicts on all counts.[50]

Mitchell and Jones both objected and requested a mistrial because one of the jurors supposedly started crying. The Court noted the objection and told counsel "I'm not pressuring them. I'm not giving a 'dynamite' instruction.[51] I'm just asking them to come back and deliberate in the morning. We will see what happens tomorrow." The following day, the jury reached a unanimous verdict on all counts of the indictment after deliberating for approximately an hour and a half.

Having considered the *Gordy* factors, the Court finds that granting a mistrial at that time was unwarranted. At the outset, the Court notes that although the jury's second note stated that it was "deadlocked," it made clear that the foreman did not see any movement "at this time." Thus, the note does not even represent a communication of total deadlock. Yet even if the jury had been deadlocked, the Fifth Circuit recognizes that the district court "is in the best position to determine whether there exists a reasonable possibility that an impartial verdict can be reached." *Gordy*, 526 F.2d 631. In ordering the jury to

---

[50]     Trial Trans., Dec. 8.

[51]     A dynamite instruction is a charge under *Allen v. United States*, 164 U.S. 492 (1896).

continue deliberating, the Court's action was not coercive
because it did not even give the jury a modified *Allen* charge,
which the Fifth Circuit has upheld in numerous cases. *U.S. v.
Hitt*, 473 F.3d 146, 153-54 (5th Cir. 2006); *United States v.
Allard*, 464 F.3d 529, 535 (5th Cir. 2006); *United States v.
Miles*, 360 F.3d 472, 482 (5th Cir. 2004); *United States v. Redd*,
355 F.3d 866, 877-78 (5th Cir. 2003); *United States v. Winters*,
105 F.3d 200, 203-04 (5th Cir. 1997).  Rather, the Court simply
instructed the jury to go home, rest, and return the following
morning to continue deliberations.  In circumstances such as
these, where the trial lasted for three and a half days and the
jury deliberated for only eight hours, the Fifth Circuit has
repeatedly held that it was not improper to deny a mistrial.
*United States v. Fields*, 483 F.3d 313, 340 (5th Cir. 2007)
(instruction to jury to "keep deliberating" was appropriate when
the jury had been deliberating for only six hours); *United States
v. Ambo*, 64 Fed. Appx. 416, at *1 (5th Cir. 2003)(trial court did
not abuse its "wide discretion" in declining to declare a
mistrial on the grounds of a deadlocked jury); *United States v.
Merhan*, 193 F.3d 517, 1999 WL 706217, at *5 (5th Cir. Aug. 24,
1999)(not an abuse of discretion to deny mistrial after jury had
deliberated for eight hours); *United States v. Serrano*, 193 F.3d
517, 1999 WL 706218, at *5 (5th Cir. Aug. 24, 1999).
Accordingly, the Court finds that the interest of justice does

not require a new trial because it denied Mitchell's request for
a mistrial.

## F.    Multiplicitous Counts

Finally, Mitchell contends that the verdicts are
multiplicitous and must be set aside.[52]  A single offense may not
be charged in more than one count of an indictment. *United
States v. Plank*, 493 F.3d 501, 503 (5th Cir. 2007)(citing *United
States v. Heath*, 970 F.2d 1397, 1401 (5th Cir. 1992)).  This rule
against multiplicitous indictments preserves the defendant's
Fifth Amendment right against double jeopardy by ensuring that he
does not receive two sentences for the same offense.  *Id.*  "The
standard for determining whether two charges render an indictment
multiplicitous is whether each charge requires proof of an
element that the other does not." *United States v. Spurlin*, 664
F.3d 954, 965 (5th Cir. 2011)(citing *United States v. Nguyen*, 28
F.3d 477, 482 (5th Cir. 1994)).  *See also United States v.
Planck*, 493 F.3d 501, 503 (5th Cir. 2007)("In deciding whether an
indictment is multiplicitous, [the court will] look to whether
separate and distinct prohibited acts, made punishable by law,
have been committed.").

At the outset, the Government contends that Mitchell's
motion is not timely under Federal Rule of Criminal Procedure

---

[52]    R. Doc. 65-1 at 10.

12(b), which requires that motions that allege a defect in the indictment must be filed before trial.[53]  Fed. R. Crim. P. 12(b)(3)(B).  In support of this contention, the Government relies on *United States v. Soape*, 169 F.3d 257 (5th Cir. 1999), and *United States v. Stovall*, 825 F.2d 817 (5th Cir. 1987).  Yet these cases simply hold that a defendant who fails to raise the issue of a multiplicitous indictment in trial court has waived that issue on appeal.  *Soape*, 169 F.3d at 265 ("Soape raises his multiplicity challenge for the first time on appeal, and our court has consistently declined to review such an argument for plain error."); *Stovall*, 825 F.2d at 821 ("Multiplicity of an indictment must be raised as a defense pursuant to Fed. R. Crim. P. 12(b) to be preserved for appeal.").  Further, even if Mitchell waived this issue, the Court can grant relief from this waiver.  Fed. R. Crim. P. 12(e); *United States v. Dotson*, 407 F.3d 387, 390 (5th Cir. 2005)("[E]ven if raising the issue pretrial were required, and even if failure to raise the issue resulted in waiver as it does for 12(b)(3) motions, the court can grant relief from such a waiver.").  The Court will therefore address Mitchell's motion on the merits.

The jury found Mitchell guilty of one count of obstruction of justice and one count of perjury.  *See* 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 1621.  As the Court instructed the jury, the

---

[53]     R. Doc. 69 at 17.

elements of obstruction of justice are (1) that there was an
official judicial proceeding; (2) that the defendant knew of the
official judicial proceeding and obstructed, influenced, or
impeded the due administration of justice in that proceeding; and
(3) that the defendant acted corruptly, that is knowingly and
dishonestly with the specific intent to subvert or undermine the
due administration of justice.[54]  Fifth Circuit Pattern Jury
Instructions §§ 2.66, 2.67 (2001); *United States v. Causey*, 185
F.3d 407, 422 (5th Cir. 1999)(requiring that defendant intended
to impede investigation).  The Court also instructed the jury
that

>       an act of influencing, impeding or obstructing justice
> includes any means producing or capable of producing an
> effect    that    prevents    justice    from    being    duly
> administered.  False testimony can provide the basis for
> a conviction so long as it has the natural and probable
> effect of interfering with the administration of justice.

*See United States v. Neal*, 951 F.2d 630, 633 (5th Cir. 1992)
(approving first sentence in prosecution under 18 U.S.C. § 1503),
and *United States v. Johnson*, 485 F.3d 1264 (11th Cir. 2007)
(explaining how false testimony can impede the due administration
of justice).

Unlike obstruction of justice, perjury does not require the
defendant to have acted with corrupt intent to impede justice in
an official proceeding.  *See* 18 U.S.C. § 1621.  Perjury does,

---

[54]    R. Doc. 56 at 10-11.

however, require that the statement at issue be false and made while under oath. As such, "[e]ach charge is proscribed by a separate statutory provision and the facts necessary to one are not necessary to the other." *United States v. Maggitt*, 784 F.2d 590, 599 (5th Cir. 1986). *See also United States v. Lewis*, 876 F. Supp. 308, 311 (D. Mass. 1994)("Obstruction of justice does not require proof of a false statement under oath, and perjury does not require proof that the defendant had the specific intent to impede justice."). This is so even though the false statements are the basis for the obstruction of justice charge. *United States v. Langella*, 776 F.2d 1078, 1082 (2d Cir. 1985)("perjury and obstruction of justice are distinct offenses under the *Blockburger* analysis"); *United States v. Harley*, 717 F.2d 1444, 1451 (D.C. Cir. 1983) (holding that it is "uncontroverted" that obstruction of justice and perjury each contain an element not in the other). *See also United States v. Perfanis*, No. 1:10-CR-0513-RWS-CCH, 2011 WL 1134310, at *5 (N.D. Ga. Mar. 1, 2011)("the offense of obstruction of justice under 18 U.S.C. § 1503 and the offense of perjury under 18 U.S.C. § 1623 are separate and distinct offenses, even when the underlying false statement giving rise to each offense is the same").

Accordingly, the Court rejects Mitchell's contention that the counts are multiplicitous. His motion for a new trial on this basis must be denied.

## III. CONCLUSION

For the foregoing reasons, defendant's motion for judgment of acquittal and motion for a new trial are DENIED.


New Orleans, Louisiana, this <u>3rd</u> day of April, 2012.


_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE